UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| vs. | :     CRIMINAL NO. 3:16CR0096 (MPS) |
| BRANDON WILLIAMS | :     August 10, 2017 |

## MEMORANDUM IN AID OF SENTENCING

Please consider this Memorandum in Aid of Sentencing on behalf of the Defendant, Brandon Williams. On March 3, 2017, Mr. Williams appeared before this Honorable Court, and pleaded guilty to count one of the Indictment charging him with sex trafficking of a minor, in violation of 21 U.S.C. § 1591(a), (b)(2) and (c). In appearing before the Court, Mr. Williams admitted his crime and accepted responsibility for his misconduct. He faces an agreed upon advisory guidelines imprisonment range of 151 to 188 months, a 10-year mandatory minimum and a maximum penalty of life imprisonment. Mr. Williams waived his right to appeal his sentence – if that sentence does not exceed 188 months' imprisonment, and a lifetime term of supervised release. Mr. Williams respectfully requests a sentence that is sufficient but would not be greater than necessary.

| Exhibit | Description |
|---|---|
| A | Letter from Victoria Williams (mother) |
| B | 1. Letter from Jocelyne Hudson-Brown (cousin) |
| | 2. (4) family photos |
| C | (4) Letters from Child |
| D | (3) Letters from Brandon Williams to Office of Federal Defender |

The Presentence Report calculates a Criminal History Category of V, rather than the parties stipulated CHC determination of IV. Based on a total offense level of 31, and a CHC V, the Defendant faces a recommended guidelines range of 168 to 210 months of imprisonment. Assuming arguendo, the PSR's calculations are correct, the Defendant respectfully requests that the Court depart to the range stipulated to in the plea agreement as permitted by *United States v. Fernandez*, 877 F.2d 1138 (2d Cir. 1989). Further, the parties negotiated in good faith and after extensive investigation, which makes the departure appropriate.

Brandon Williams, who was 34 at time of the offense, is much more than a street-level pimp. As letters from his son show, he is a dedicated father to his 15-year old daughter, and 13-year old son. And a letter from his mother attests, he is a loving and devoted son. As his correspondence written to his attorneys offer, Mr. Williams is a thoughtful, respectful, and considerate person.

Notwithstanding the considerable obstacles that lie ahead, Mr. Williams is determined to make the most of the remainder of his life. He will use his time in the Bureau of Prisons to learn a trade so that he can provide a lawful source of income, to make his mother, siblings, and children proud of him again.

## 1. HISTORTY AND CHARACTERISTICS

Mr. Williams is not proud of the behavior he exhibited prior to his arrest in this case. He acknowledges the wide spread impact his actions had on people in his community, the victim in this case, and his family. He is a product of Bridgeport, Connecticut and shares in all its richness – its triumphs and its tragedies. Born in 1981, to Victoria Williams and Brent Williams, Brandon was the youngest of three maternal brothers, and one paternal sister. Ms. Williams was a single parent,

and at times sent her sons to foster homes. Brandon reports how he and his brothers often made efforts to return home during those periods. Ms. Williams' mother, Edna Williams, also cared for Brandon on weekends. Ms. Williams had a close friend, Juaquina Smith Shaw, who helped raise Brandon. Ms. Williams admits, "She helped raise Brandon because I didn't know what I was doing." Ms. Smith Shaw helped Victoria look after Brandon and brothers.

Victoria Williams is 63 years old. She was a stay at home mother for most of Brandon's life. Though she is not currently employed, Ms. Williams serves as a volunteer at Bridgeport Hospital. Brandon often lectures her about the dangers of volunteering in the evenings. Hospitalized after suffering several strokes, Ms. Williams explains, she is, "not feeling too well – it's an ongoing thing." She remains in Bridgeport and is under continued medical care.

From a young age, Ms. Williams experienced repeated trauma. She never knew her father. She witnessed her mother's physical abuse. She was sexually abused by her stepfather beginning when she was in 4th grade. She was sent to a foster home and experienced more abuse. And as an adult she dated men who were physically and emotionally abusive. According to Ms. Williams, Brandon observed how she hid her scars with makeup, which she concedes, "...probably scarred him." She doesn't believe Brandon ever witnessed her abuse – first hand – though.

As a consequence, Ms. Williams believes that "...having all this inside" affected Brandon and her other children, "...psychologically and mentally." She holds that her history of abuse was partly to blame for her inappropriate behavior towards her children. Ms. Williams described how she would yell at them, and hit them, because that's all she knew. She offers, "I wasn't taught how to love my children," and is learning now, to do so.

At 26 years old, Brandon met his father for the first time. Because his father contested paternity, Brandon paid for DNA test to prove their biological connection. Brandon's father has

little to no contact with Brandon today.

### a.    Childhood

As indicated above, Brandon and his brothers spent time back and forth between living with their mother and foster homes. He "lived in and out" of his mother's home from the time he was 15 years old, and was sent to Manson Youth Institution (MYI), where he remained for two years. Brandon also spent his early youth with his maternal grandmother, who worked as a live-in nanny. When she was not working Brandon's grandmother stayed at the Holiday Inn or Days Inn in Bridgeport, where Brandon visited. She slept in hotels during weekends and returned to work on Monday mornings.

### b.    Children

As a father, Brandon is concerned about his children's future while he is in prison. For instance, his 15 year old daughter is in the care of Connecticut Department of Children and Families. His daughter has no one with whom she can reside. His 13 year old son, lives in Rochester, New York, with his mother. Before his incarceration, Brandon often spent time with his son, enjoying sports and regular conversations. Despite his daily marijuana, cocaine and alcohol use, Brandon abstained, fully, when he was with his son. He argues, "I can't be high or drunk" in front of his son and has to remain, "focused on him."

### c.    Mental Health

Still, Brandon conveys, he uses drugs and alcohol as a way to treat his mental health disorder. He was diagnosed with Depression Disorder in 2006. He was prescribed Remeron but, "left that alone," because he experienced weight gain, memory loss and overall ill effects.

### d.    Rounding out the Family

Brandon's older sister, Ebony, tells the story of first learning about her younger brother. Though her parents have been married for 44 years, Ebony was raised in Bridgeport, with her mother, while her father, Brent Williams, lived separately in New Haven. About ten years ago, Ebony's father complained to her about a letter he received from Connecticut Social Services regarding his lack of contributions for Brandon. Ebony was surprised, but managed to obtain Victoria Williams' contact information. From there, she contacted Brandon, and they established a relationship. The two talked on the phone daily, and she met him for the first time while he served a sentence at Bridgeport Correctional Center.

Moreover, the bond between Brandon and Ebony has, only, strengthened over time. In contacting Ebony, she reports, "I am on him," more than his mother is. She allows that Brandon's mother is sick and does not have good enough health to be "on him" the way he needs. "Her heart is in the right place but she is going through her own issues." Ebony conclude that if Brandon were on the right track he would be better able to help his mother.

### e.    Education and Training

In 2012, while incarcerated for three years, Brandon took the GED exam at Cybulski and "passed everything except math and science." He also participated in Parenting, Stress Management and Relationship Techniques (SMARTS), Machine Technology and a Bible class. Brandon did "whatever I could do, especially if it comes with certificates," because the certificates made him feel as though he was progressing in life.

## 2.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Brandon Williams pled guilty to one count of sex trafficking of a minor. The facts of the

offense are outlined in the Presentence Report at paragraphs 5-37. The Minor Victim (MV), at age 17, ran away from the custody of the Connecticut Department of Children and Families during the summer of 2015. On or about July 10, 2015, MV was kidnapped by Mr. Williams' co-defendant, with the promise of a modeling career. However, MV was employed by co-defendant as a prostitute. She also danced at a local gentleman's club for additional financial support. The co-defendant provided MV with a fake driver's license that included, MV's photograph, a false name of "Martha Blake," and listed her as 24 years old. They resided at a local Bridgeport motel during this period.

For better or worse, MV and Mr. Williams developed a strong bond. The same day she was kidnapped by the co-defendant, she met Mr. Williams, who resided in the same Bridgeport motel as his co-defendant. Initially upon meeting MV, Mr. Williams was under the impression MV was of adult age, as MV held herself out as an adult. MV and Mr. Williams spent time in Mr. Williams' room, where they talked, watched television, and sometimes partied. Their friendship grew to where MV called Mr. Williams to bring food to the gentleman's club – when she had no money and was hungry. (7/21/15 "Ok flacca. Love is trust, I'm concerned about the type of trust you dance and deal with dudes that want to pay for sex, I'm only to pay for time and nothing else, that is y I stay how and where I stay so you go ahead and bring some starving stick up kids here if you want to. .I will be here with my company call me yo. Love you I think" Gvt. Discovery p. 310). During the time Mr. Williams' son stayed at the hotel with Mr. Williams, he did not party with or display any affection towards MV, nor anyone else. Eventually, Mr. Williams and MV's relationship turned romantic. In fact, by the time he learned MV was 17 years old, Mr. Williams was already in love with her. And, despite her age, MV reciprocated the sentiment. ( 8/20/2015 "I love you my king you mean thw world to me…" Gvt. Discovery p.174).

The co-defendant was physically abusive towards MV, which lead to the formal end of their relationship. MV and Mr. Williams left the motel and moved into another one in the area. Admittedly, MV agrees she did not begin to work as a prostitute when she first moved in with Mr. Williams. Backpage records show that between August 6 and August 22, 2015, 16 ads were posted for MV in both Connecticut and New York. In all, Mr. Williams was involved in the prostitution business for 20 days, as he was arrested on August 26, 2015.

Throughout, Mr. Williams was never violent with MV. Nor did he force her to tattoo herself with his name or symbol. To the contrary, MV contacted the tattoo artist with her designs in mind. (8/15/15 "Lol, nah. I'm just getting his name on my neck and a symbol on my face wondering about the time." Gvt. Disc. P. 204). One theory is MV might have been motivated to make false allegations of violence as she suspected Mr. Williams was unfaithful. (8/23/15 Why do i feel like you still seeing her ! Why do i." Gvt. Disc. p. 162)

Mr. Williams's conduct unquestionably falls within the prohibition of Section 1591. However, the facts recited in the PSR show his conduct to be small in scale when compared to the sort of criminal activities that motivated Congress in enacting the statute (and the ten-year mandatory minimum). The statute was enacted as part of the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 (2000) ("TVPA"), which included congressional findings demonstrating the intent behind the legislation, codified at 22 U.S.C. § 7101. In enacting the TVPA, Congress found trafficking to be a "contemporary manifestation of slavery" based on findings that included the following:

> (4) . . . Traffickers lure women and girls into their networks through false promises of decent working conditions at relatively good pay as nannies, maids, dancers, factory workers, restaurant workers, sales clerks, or models. Traffickers also buy children from poor families and sell them into prostitution or into various types of forced or bonded labor. . . .

> (6) Victims are often forced through physical violence to engage in sex acts or perform

slavery-like labor. Such force includes rape and other forms of sexual abuse, torture, starvation, imprisonment, threats, psychological abuse, and coercion. . . .

(8) Traffickers in persons is increasingly perpetrated by organized, sophisticated criminal enterprises. Such trafficking is the fastest growing source of profits for organized criminal enterprises worldwide. Profits from the trafficking industry contribute to the expansion of organized crime in the United States and worldwide. Trafficking in persons is often aided by official corruption in countries of origin, transit, and destination, thereby threatening the rule of law.

22 U.S.C. § 7101.

Mr. Williams's actions do not implicate the congressional concerns outlined above. He did not lure MV into the prostitution trade under some "false promise" of a legitimate job. Nor did he force MV to participate in "slavery-like labor" through rape, torture, or starvation. During congressional hearings regarding the TVPA, numerous congresspersons repeatedly identified the need to pass legislation combating the use of imprisonment and torture to force persons into the sex trade. *See, e.g.*, 146 Cong. Rec. S2729-01, S2768 (April 13, 2000) (Sen. Brownback explaining that girls are physically abducted, beaten, and held against their will, sometimes in chains); 146 Cong. Rec. H2686 (Rep. Abercrombie stating "[t]raffickers use rape, starvation, torture, extreme physical brutality and psychological abuse to force victims to work in horrible conditions as prostitutes"); 146 Cong. Rec. H7630 (Rep. Jackson-Lee stating "[t]rafficking victims suffer extreme physical and mental abuses, including rape, torture, starvation, imprisonment, death threats, and physical brutality").

Undoubtedly, sex trafficking of a seventeen-year-old is a serious crime for which the Defendant, here, deserves to be punished. But Section 1591's harsh penalties were targeted towards more extreme conduct involving organized enterprises that traffic multiple women using force, fraud, and coercion. That is not to excuse Mr. Williams's conduct, but it is to say that Mr. Williams's crime is among the less egregious reached by the statute.

### 3. THE NEED FOR THE SENTENCE IMPOSED

#### a. To Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense

Sex trafficking is, without any doubt, a serious crime. A sentence of 10 years – is more than twice the amount of time Mr. Williams has ever been incarcerated.

In addition to at least a five year term of supervised release, Mr. Williams will be required to register as a sex offender. Sex offender registration is a severe social stigma, one that is typically associated with pedophiles and child pornographers. Many courts have recognized that collateral consequences of conviction, such as sex offender registration, are relevant to the need for the sentence imposed to reflect just punishment. *See, e.g.*, *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (appropriate for district court to consider the lasting effects of being required to register as sex offender in imposing sentence).

It is also worth noting that Mr. Williams, unlike many defendants facing a mandatory minimum sentence, elected to plead guilty rather than go to trial. In waiving his right to a trial, Mr. Williams spared MV the trauma of having to testify. That Mr. Williams took responsibility for his actions and admitted his guilt is surely relevant to determining an appropriate punishment in this case.

#### b. To Afford Adequate Deterrence to Criminal Conduct

A sentence of no more than 10 years, followed by at least five years of supervised release, and sex offender registration, is unquestionably severe and will undoubtedly provide general deterrence to this conduct.

In terms of specific deterrence, Mr. Williams's longest prior prison sentence was 54 months. As the Second Circuit has noted, "Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offense." *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001).

### c.    To Protect the Public from Further Crimes of the Defendant

When he committed the instant offense, Mr. Williams was 34-year-old man – trying to find his way. By the time he is released from prison he will be in his mid-40s. Although the BOP is far from perfect, one thing it does do adequately is provide vocational training, particularly to inmates who are serving long sentences. Following his release from prison, Mr. Williams looks forward to finding a stable job and helping his family.

A 2016 U.S. Sentencing Commission study on recidivism among federal offenders showed a direct correlation between a defendant's age at the time of his release and recidivism. Prisoners released between the ages of 36 and 40 years are rearrested 48.8 % of the time, compared to 66.4% for those aged 21 to 25. U.S.S.C., *Recidivism Among Federal Offenders: A Comprehensive Overview* at 23. Although the study found a correlation between higher criminal history scores and recidivism rates, offenders with higher offense levels showed no greater rates of recidivism. *Id.* at 18-21.

### 4. THE SENTENCES AVAILABLE, THE GUIDELINES, AND ANY RELEVANT POLICY STATEMENTS

While the Court is required to correctly calculate the applicable Guidelines range, it may not

treat that range as mandatory or presumptively reasonable. *Gall v. United States*, 552 U.S. 38, 49 (2007). Instead, the Court must treat the Guidelines range as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

The sex-trafficking Guideline is not entitled to any deference. That is because the Guideline, which is not based on empirical evidence, does not "reflect a through approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 338 (2007). Accordingly, "unless applied with great care," this Guideline "can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Dorvee*, 616 F.3d at 184.

The Court, of course, "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101 (internal citation and quotation marks omitted). In fact, sentencing courts "may not presume that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50.

To determine what deference to give a particular Guideline, courts evaluate whether the Sentencing Commission, in promulgating or amending it, acted in "the exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 109. As described in Rita, the exercise of this role has two basic components: (1) reliance on empirical evidence of pre-Guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field. *Rita*, 551 U.S. at 349-51. The use of empirical evidence to support a Guideline is of paramount importance because, although Congress directed the Commission to design the Guidelines based on the purposes of sentencing set forth in § 3553(a)(2), see 28 U.S.C. § 991(b), a "philosophical problem" arose when the commissioners could not agree on which purposes should predominate. Accordingly, they abandoned that approach and instead

"took an 'empirical approach,' beginning with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past and then modifying and adjusting past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like." *Rita*, 551 U.S. at 349 (citations omitted).

As for a particular Guideline, if the Commission relied on past practice, and then reviewed and revised the Guideline in response to data and feedback from judges and others in the field, in the typical case it may be "fair to assume" that the Guideline "reflect[s] a rough approximation of sentences that might achieve § 3553(a) objectives." *Id.* at 350. Where, however, the Commission has departed from its empirical approach, and a Guideline is not the product of "empirical data and national experience," a court may conclude that it fails to achieve the § 3553(a) purposes. *See Kimbrough*, 552 U.S. at 109-10.

Because the sex-trafficking Guideline does not "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives," *Rita*, 551 U.S. at 350, this Court is free to exercise its discretion to depart to a sentencing range that more appropriately achieves § 3553(a)'s purposes.

The original version of Section 1591 made effective on October 29, 2000 contained no mandatory minimum. *See* 18 U.S.C. § 1591 (2000). When Congress passed the PROTECT Act in 2004, it added a five-year mandatory minimum for Mann Act offenses, but Section 1591 continued to carry no mandatory minimum. The Sentencing Commission responded to the PROTECT Act by restructuring the Guidelines, creating § 2G1.3 to cover crimes under 1591 and the Mann Act. The first version of § 2G1.3 included a single base offense level of 24, "to account for the new mandatory minimum terms of imprisonment established by the PROTECT Act." U.S.S.G. Amendment 664. The other enhancements were effectively the same as they are today, including enhancements for the use of a computer (two levels) and the commission of a sex act (two levels).

In July 2006, with the passage of the Adam Walsh Act, Congress raised the mandatory minimums for a violation of 1591(b)(2), Mr. Williams' offense, to 10 years. The Sentencing Commission responded by passing Amendment 701, which created correspondingly higher offense levels, including a base offense level of 30 for offenses involving 1591(b)(2).

While Congress is free to pass mandatory minimum sentences, the Sentencing Commission's reflexive increase in base offense levels to keep pace with those increases is not entitled to deference. The effect of the six-level increase in the base offense level is to create recommended sentences that are significantly longer than the minimum term. Enhancements that are present in nearly every case drive sentences higher and higher.

For example, Mr. Williams is assessed a two-level enhancement because the offense involved the use of a computer. Amendment 701 explicitly noted that a computer was used in 95% of prosecutions under 18 U.S.C. § 2422 (coercion and enticement); one can only assume that computer use has become even more ubiquitous since Amendment 701's enactment in 2007. Mr. Williams is also assessed a two-level enhancement because the offense involved a "sex act of sexual contact," an enhancement that applies in every case that proceeds beyond the attempt stage.

Absent these two enhancements, which are present in nearly every sex trafficking case, Mr. Williams's Guideline range would be 100-125 months' imprisonment, a far more reasonable starting range than the 151-188 month range he is now facing.

## 5. THE NEED TO AVOID UNWARRANTED SENTENCING DISPARTIES

There have been few analogous prosecutions of 18 U.S.C. § 1591(b)(2) in this District. However, the sentences that have been handed out in the following cases are instructive. Collectively, they suggest that a sentence of no more than 120 months is necessary in this case to guard against unwarranted sentencing disparities.

In *United States v. Bruce Da*mico, 3:10CR225(SRU), defendant Damico pled guilty to one count of sex trafficking of minors. Judge Underhill imposed a sentence of 121 months. According to the Government's sentencing memorandum,

> The defendant profited, among other ways, through collecting $100 per day or the task of driving the girls to prostitution appointments and posting advertisements on the Internet. In addition, the defendant sold drugs to these women at above "street prices," which had the effect of reclaiming much of the money they made, and often made the women dependent on the defendant, especially in places that were unfamiliar and where the women were otherwise unable to satisfy their addictions.

Gov't Sentencing Mem. (Dkt. No. 50) at 1.

In *United States v. Kamar James*, 3:12CR266(VLB), defendant James pled guilty to one count of sex trafficking of a minor. His stipulated Guidelines range was 120 to 135 months. The Government, unlike here, argued for a sentence at the high end of the range. This Court sentenced Mr. James to 120 months' imprisonment, to be followed by 5 years' supervised release.

In *United States v. Edward Thomas*, 3:14CR31(RNC), Mr. Thomas, a recidivist sex offender in his 40s, was accused of pimping two minor victims. He went to trial, thereby forcing one of the minor victims to testify at length. According to the Government's sentencing memorandum, "[f]or the last ten years, the defendant . . . has made his living from the commercial sexual exploitation of women, particularly minors." Gov't Sentencing Mem. (Dkt. No. 184) at 1. The Government advocated a sentence of 20 years, notwithstanding the Guidelines range of 360 to life. Judge Chatigny sentenced Mr. Thomas to 210 months (17 ½ years).

In *United States v. Jordan Anate*, 3:15CR203(VLB), Judge Bryant, agreed with the parties' recommendation, and because of the proximity of ages between the defendant and minor victim, their relationship, and the duration of time Mr. Anate was engaged in the underlying criminal conduct, sentenced Mr. Anate to 120 months.

While few in number, these cases are illustrative of the kinds of sentences imposed in sex

trafficking cases in this District. In the absence of aggravating factors, a sentence of 120 months'

imprisonment is sufficient, but not greater than necessary.


## CONCLUSION

Given the seriousness of his criminal conduct, Mr. Williams understands and accepts the

consequence of imprisonment. He is a remorseful man who deeply regrets what he has done, his

absence of good judgment, and the harm he has caused. He looks forward to the day he will return

to the community to resume a life as a contributing member, trying to find gainful employment and

sustained treatment. The sooner he can do so, the better for not just him but for the community as a

whole. For the reasons discussed in this memorandum, in addition to any other deemed appropriate

by the Court, Brandon Williams respectfully requests that the Court impose a sentence sufficient but

not greater than necessary to meet all the purposes of sentencing in this case.


Respectfully submitted,


THE DEFENDANT,
Brandon Williams



Dated: August 10, 2017


_____/s/   Tracy Hayes_
Tracy Hayes
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT. 06510
Bar No. phv06527
(203) 498-4200
Email: tracy_hayes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 10, 2017, a copy of the foregoing Memorandum in Aid of Sentencing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Tracy Hayes
Tracy Hayes



# EXHIBIT A

The Honorable Michael P. Shea
United States District Judge
450 Main Street
Hartford, CT 06103

Dear Judge Shea:

My name is Victoria Williams. I am Brandon Williams' mother. I have been knowing him since birth. He is a wonderful young man.

My son volunteers with me serving the homeless at my church. He attends church at times with me. When my mother was alive, he would go and take care of her. He was there for her until she passed. Brandon worked odd jobs since he was about 10-12 years old. My friends or neighbors would let him clean the leaves in the yard or shovel snow. He also worked with Robert Wade, the elder of the church at his car shop trying to teach him to become a mechanic. He also cleaned his shop.

Brandon Williams is a loving and giving person. If he sees that someone is being mistreated, he will try to rescue them. When he was younger, he would try to help small animals. When I broke my leg and had a full cast on my leg, he was there for me. He went to school and came home and made sure I was okay. He changed his brother's bandages when he was shot. One of the jobs my son had was cleaning apartments after someone had died and several other jobs.

Brandon has a good heart and he has the kindness to help the homeless. One day we were walking to the store and my shoes broke to the point that I had to walk barefooted. He offered to buy me some shoes from Goodwill. My son has a heart of a saint.

I am not a very well person. I have suffered a heart attack, a stroke and I have fallen in my house and had been hospitalized and Brandon has been there with me. I also have a bad back and sometimes I can not walk. I have a plate and 4 screws in my neck and in my lower back.

As a parent, Brandon loves his children and he spends as much time with them as he can and the mothers of the children. He also treats the mother's children as his own.

Brandon did not really know his father until he was 26 years old and his father had him pay for a DNA test.

Brandon is a great and intelligent young man with a lot of love to give.

Thank you for taking the time to listen to my plea.

God Bless You,


Ms. Victoria Williams.



# EXHIBIT B

To: Honorable Judge Michael P. Shea c/o Tracy Hayes
From: Jocelyne Hudson-Brown

Re: Brandon Williams

Greetings Your Honor:

This correspondence is an effort to share some kind words on behalf of Brandon Williams. Brandon Williams is my cousin so I have known him all of his life. I am about 20 years older than he. His Grandmother and my Mom are sisters. I remember Brandon as a quiet and shy boy who never said much. His weekends were spent with his Grandmother Edna who had a standing reservation at the Holiday Inn in Bridgeport on weekends for years. From her influence at the very least he was taught manners and respect. He loved her dearly and was often one of her primary caretakers until she died.

. As a kid growing up he would write me letters while I was away in the Army a correspondence that remains in place today unfortunately now from a jail cell on his part. My last note being a 2016 Christmas card and now this. At the very least I can sincerely say that we love him dearly and even though he has been in and out of jail for many years during his short stays at home he is always very much a part of our lives. I have attached four photos to attest to such.

Pic 005 - Brandon with his son at my Mom's 75 birthday party.
Pic 002 - Brandon with his Mom at her birthday celebration
Pic 188 - Brandon with family celebrating his birthday
Pic 194 - Brandon with family and his friend (tall fella in the back of Brandon), note his big brother giving him rabbit ears,

Brandon's birthday celebration that year sticks in my mind and I think often about what he said as we were leaving the restaurant and I was taking this group photo. "This is the best day of my life" he said. To see him so happy about a simple lunch at the diner, a cake, some small gifts and all of our attention said a lot about his life both past and present at that time. To this day when I think about Brandon I think about how happy he was and those words.

It is my hope that this note shed a bit of light on the person of Mr. Brandon Williams. Thank you for your consideration. Wishing Cousin Brandon all of the best!

*Jocelyne Hudson-Brown M.A.*
*JHB Media & Public Relations*
*P.O. Box 251*
*New Haven, CT 06513*
*Tel/Fax: 1.203.843.7421*
*Website: jhbmpr.weebly.com*
*Blog: jocelynehudson-brown.blogspot.com/*











**EXHIBIT C**

Dear dad

from ████

Dad My best Player is all the Cavs
Players, but Dad you didnt answer my question
When do you get out OUt, but any I Play
point, and season didnt start, im big Mon
and I am a good basetball Player and
you need to start anwo here question
and see you soon and for or the
clothes look what are those? I'm a
Drawer Oh Mare and do you
tube video ya, but did grandma write
You and my hair is golden and curly
and I never liked the bulls I just
lic derick rose and their logo man,
and I still have that cavs hat
You gove me good times, Merry
Christmas and when you get outta
jail I need to know has soon
has possible that would make my
Day and what jail feel like and
what does it look like and
what game lol probuise suckas
lol ya its haha. I Pray ya ball
just kidding. Have a good
day love a You

from ████████

DaD you will never beat me in 2k you beat me once, but that's the old game, but... I beat you in madden and DaD my handle and shooting got better and thanks for the bible thing that I don't know to spell, but DaD in football I did the most craziest catch ever it was one-handed then I fell. Im faster. and these letters take forever I be thinking about you then they don't come, but when I don't it comes lol, but if you wanna switch to steelers go ahead but don't be a bandwagon stay with ravens steve smith going to retire and the NC is for 2k and John Cena is one of my favorites and his Dont worry about my sister just wait for her to write you and girls are weird, they get mad fast and worry about boys and merry Christmas, love you

1 # DaD

hey Wassup DaD this letter Might get
out to you late because we had a
really bad Wind storm really bad, tree fallen
down. But happy birthday yay. When we
Play basketball im gonna 21 zip you
lol, I have handles sir and grades
are good and grandma Send me Pictures
of me and you and the giants. got
brandon marshall, that's gonna be crazy and
Now I got dreads Now, what haircut
you have.

bye love you

#1 DaD

HAPPY

Birthday

William

hey, Dad i been busy with studying and
projects and all that. and i'm going to beat
you in basketball badly and in 2K. man
did you know they put 2K for $150 that's
crazy and cavs are doing good. Just checking
in on you. see you soon

1# love Naz

Father ♥ i love you

♡

hope
you
come
back
soon

Naz
Williams

I been crossing kids over
in basketball your Nex2

happy ~~~~ early fathers day
to the best father in
the world love you so much



# EXHIBIT D

I'm writing to say thank you to you as well as your
Staff. I also would like to say thanks for the extra
time, consideration, patience and representation that is being used
Happy fathers Day Mr. Tracy Hayes

Thank you Brandon Williams

RECEIVED
JUN 15 2017

Season's Greetings MR. Tracy HAyes

I'm writing to Say Thank you for your time and representation, have not heard anything so I assume things are heading more to the good.

However I'm wishing to send a happy holidays to you and yours as well as your Co-workers and friends.

Merry Christmas and d HAppy New Year"

RECEIVED

NOV 2 1 2016

Greeting!

I'm writing to say thank you for your time, consideration as well as your representation even If It's Not shown In its proper fashion.

Last but not least I would like to wish you, yours and the prosecutor along with the others a pleasant Thanksgiving And happy holidays !!

Brandon Williams